EOD 12-17-02

FILED-CLERK
U.S. DISTRICT COURT

02 DEC 17 PM 4:49

TEXAS-EASTERN

BY Joya McEwen

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| ALCATEL USA, INC., | § | |
| Plaintiff | § | |
| | § | |
| | § | Civil Action No. |
| v. | § | 4:00cv199 |
| | § | |
| | § | |
| CISCO SYSTEMS, INC., | § | |
| Defendant | § | |

## MEMORANDUM OPINION AND ORDER GRANTING CISCO'S RENEWED MOTION FOR SUMMARY JUDGMENT FOR LACK OF REMEDY (DOCUMENT NO. 628)

Pending before this Court is Defendant's Renewed Motion for Summary Judgment for lack of remedy. Having considered the Motion, Response, Reply, all of the summary judgment evidence, expert report and declaration of Steven Wiggins, and arguments of counsel, the Court is of the opinion that Defendant's Motion for Summary Judgment should be granted.

### BACKGROUND

This lawsuit between Alcatel USA, Inc. ("Alcatel" or "Plaintiff") and Cisco Systems, Inc. ("Cisco" or "Defendant") arose out of acts of patent and copyright infringement and torts allegedly committed by Cisco, an Alcatel competitor, and a company it previously acquired. Through the three and a half year history of this case, certain claims and affirmative defenses, such as Alcatel's claims for copyright infringement and conversion, have been dismissed on summary judgment. In addition, Alcatel's claim for patent infringement has been voluntarily dismissed by the parties and Alcatel previously dismissed its claims in equity. In its present form, the lawsuit primarily concerns claims for misappropriation of trade secrets and civil theft under the Texas Theft Liability Act. At the heart of the dispute lies the allegation that Monterey Networks, Inc. ("Monterey"), Cisco's predecessor-in-



interest, systematically misappropriated and used cutting-edge Alcatel technology to develop and market a product called the Wavelength Router, which is a telecommunications product allegedly designed to compete directly with Alcatel's telecommunications products. Resulting from this alleged misconduct, Alcatel seeks over $500 million in damages.

I. Factual Background and Allegations:

Alcatel is a designer, developer and marketer of highly sophisticated telecommunications equipment, including optical cross-connects. A cross-connect is a system that connects signals in multiple telecommunication input lines to multiple telecommunication output lines. Cross-connects are used to route or switch signals from input lines to output lines in an optimal manner that makes efficient use of a telecommunications transmission network in the event of a network failure. An "optimal cross-connect" is essentially a cross-connect that works with input and output optical signals on fiber optic cables.

In 1995, Alcatel commenced development of its first-generation optical cross-connect. This cross-connect, the 1680 Optical Gateway Cross-Connect ("OGX"), was comprised of computer software and telecommunications hardware that performs the actual switching or routing of signals and computer software that controls the hardware.[1] The first release of the OGX was completed by Alcatel in 1999, after which it was sold to various long distance telephone carriers with large telecommunications networks, such as MCI, AT&T, Level 3, Bell Canada, and SBC

---

[1] The OGX uses two broadly-defined types of software: (1) administrative software (also sometimes referred to as Level One software) which, among other things, monitors and controls how to make connections between input and output signals in the telecommunications network; and (2) operational software, which actually carries out the connections determined by the administrative software. The administrative software, being essentially the nerve center, is the most complex and critical component of the OGX, and consequently, is the result of substantial investment and long-term research and development.

Telecommunications.  In 1998, prior to the initial release of the OGX, Alcatel began developing what was then expected to be its next-generation optical cross-connect.  This product, the 1680 Optical Layer Cross-Connect ("OLX"), was based in part on the administrative software from the OGX.

Founded in July of 1997 in California, Monterey was formed to develop an optical cross-connect called the G-640X, which was ultimately replaced by a product called the Wavelength Router.  In late 1997, Monterey moved to Richardson, Texas and began hiring highly skilled employees from Alcatel's Optical Networks Group.  By August 1998, Monterey had hired approximately ten former Alcatel engineers.  According to Alcatel, these employees possessed knowledge of highly confidential, technical and marketing information relating to Alcatel's products, including application specific integrated circuits ("ASIC") designers, software architects, software programmers, and technical marketing specialists.  Among the workers that Monterey hired was Marian Trnkus, who was formerly engaged as a contractor for Alcatel on its administrative software development for the OGX.  Sometime in 1995, while he was conducting software development and subsystem conversion at Alcatel, Trnkus created various software programs known as "Whip," "WhipSource" and "Makedep." These computer programs, in addition to the knowledge of Alcatel's customer's (AT&T's) requirements and general cross-connect architecture and management functions, form the basis of Alcatel's alleged trade secrets.

Alcatel contends that Monterey initially planned to develop a cross-connect product that was distinctly different than Alcatel's OLX product.  However, through Monterey's acquisition of Mr. Trnkus and various other former Alcatel employees, as well as Monterey's acquisition of the knowledge of AT&T's needs with respect to a next generation of cross-connect products, Alcatel

3

maintains that Monterey designed, developed and marketed a competing product called the Wavelength Router, which was allegedly designed specifically to satisfy AT&T's needs.  This Wavelength Router, according to Alcatel, was comprised of the administrative software architecture and trade secrets that formed Alcatel's OGX.  In July of 1998, Monterey hired Mr. Trnkus to work on the software development and architecture for the Wavelength Router, which was Monterey's only product.  While Trnkus was at Monterey, Alcatel claims that the architecture for Monterey's Wavelength Router changed dramatically and included several principal elements not included in the original Wavelength Router architecture.  According to Alcatel, however, these principal elements were present in the OGX architecture.  Furthermore, Monterey did not begin to write software code for the Wavelength Router until November 1998.  However, around June of 1999, only seven months later, Monterey demonstrated the Wavelength Router to potential customers at the SuperComm Trade Show, a large telecommunications equipment conference.  According to Alcatel, Monterey's highly abbreviated development schedule for the Wavelength Router was made possible as a result of Monterey's misappropriation of Alcatel's intellectual property, and specifically, Mr. Trnkus's duplicating at Monterey what he and other software engineers created at Alcatel.[2]

---

[2] Cisco disputes Alcatel's contentions.  For instance, Cisco claims, among other things, that Monterey's founders were experienced telecommunications engineers who came up with a creative and novel idea for an optical networking telecommunications product in late 1997, months before Monterey hired the first person from Alcatel.  By April 1998, Cisco contends that Monterey had completed its architectural framework and software structure for their product.  It was only after these designs were established that Cisco claims Monterey first hired a person previously employed at Alcatel.  Furthermore, Cisco claims that, contrary to Alcatel's assertion, AT&T was Monterey's most important target customer well before Monterey hired its first former Alcatel employee.  In addition, Cisco contends that when it learned of Alcatel's potential claim over Trnkus's software creations, Cisco took immediate steps to eliminate any possible risk of impropriety.  For instance, because Trnkus failed to disclose his prior development of his software creations on his employment agreement with Monterey, Cisco terminated Trnkus's employment.  Cisco then claims to have taken immediate steps to begin a "clean room" development of software utilities to replace Trnkus's programs at Monterey.

Alcatel maintains that getting the Wavelength Router ready to market quickly was critically important to Monterey for at least two reasons. First, obtaining the business of AT&T, as well as other large carriers, was contingent upon Monterey's ability to quickly develop the Wavelength Router. Second, and relatedly, being fast to the market increased the likelihood of Monterey being acquired by Cisco, as well as the amount such acquisition would yield. As Alcatel argues, Monterey's ability to obtain AT&T's business increased its acquisition value to Cisco. Alcatel asserts that Cisco was not at that time a major supplier of equipment to AT&T and other large telecommunications carriers. Cisco, however, made it a strategic priority to become a major supplier to those companies. Accordingly, Monterey's potential for obtaining significant business from AT&T was critical to Cisco's interest in Monterey.

In May of 1999, Cisco invested $19.5 million and acquired a 9.75 percent interest in Monterey. In June 1999, Monterey submitted a proposal to AT&T, and AT&T selected Monterey as one of the finalists for the next-generation cross-connect project. On August 24, 1999, Cisco publicly announced its intention to complete the acquisition by purchasing the remaining 90.25 percent of Monterey's equity for $517 million. The transaction closed at the end of September 1999. Prior to the final close of the transaction, however, Alcatel sued Monterey on August 31, 1999 in state court under a theory of inevitable disclosure of trade secrets. The Honorable Margaret Keliher in the 44th Judicial District Court of Dallas County, Texas held a hearing on Alcatel's application for a temporary injunction on February 22, 2000. The following month, Judge Keliher issued an order granting in part and denying in part Alcatel's application. Furthermore, at about this time, Cisco received news that AT&T was terminating its potential relationship with Cisco for the Wavelength Router. Having lost its largest potential customer, Cisco struggled to make its product

5

a commercial success. In August of 2000, Alcatel filed suit against Cisco in this Court for over $500 million in damages. In April of 2001, due to its failure to complete any sale of the Wavelength Router, Cisco cancelled its project.

## II. Procedural Background:

This Court has long been suspicious of Alcatel's alleged entitlement to an award of over a half a billion dollars. During a hearing in July 2001 on various pending motions in this case, the Court, *sua sponte,* questioned the propriety of Alcatel's prospective damage theory. To help dispel these concerns, the Court ordered the parties to brief the legal viability of Alcatel's damage theory. Alcatel submitted its brief on August 27, 2001. In its brief, Alcatel argued that it was entitled to recover the value of the trade secrets at the time of the misappropriation. Alcatel further argued that this value could be measured based on a reasonable royalty or unjust enrichment. In response to Alcatel's brief on damages, Cisco filed a motion for summary judgment on September 18, 2001. [Doc. No. 303]. In its motion, Cisco argued that Alcatel's damage theory was untenable because Alcatel had not suffered any lost profits as a result of the alleged misappropriation and that, due to its cancellation of the Wavelength Router, Cisco had not profited from sales based on Alcatel's intellectual property. Accordingly, for these and other reasons, Cisco insisted that Alcatel could not recover pursuant to any conceivable damage theory.

At the end of March 2002, The Court issued its order denying Cisco's motion for summary judgment for lack of remedy. [Doc. No. 549]. In so doing, the Court identified at least one approach to damages that was conceivably available to Alcatel, a reasonable royalty method. The Court's ruling was supported by the Fifth Circuit's decision in *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518 (5th Cir. 1974). There, the court identified a reasonable royalty

6

approach to damage calculation as an appropriate measure where, for example, the trade secret has not been destroyed, where the plaintiff is unable to prove specific injury, and where the defendant has not gained any profits by which to value the secrets. In denying Cisco's motion for summary judgment, however, this Court's order clarified that, due to the on-going expert discovery, it was not undertaking a factual evaluation at that time into the validity of any one particular damage theory. The Court noted that it was premature to evaluate the factual or legal bases upon which all theories of damages could be based.[3] Indeed, in resisting Cisco's original motion for summary judgment for lack of remedy, Alcatel stated in its response brief that "much of the information relevant to damages will be developed through expert testimony. As expert discovery is yet to come in this case, Cisco's complaints [regarding the legal and factual insufficiency of Alcatel's damage claims] are substantially premature."

In March of 2002, at about the time the Court issued its order denying Cisco's motion for summary judgment for lack of remedy, Dr. Steven Wiggins, who is Alcatel's damage expert, issued his report in support of Alcatel's damage theory. Dr. Wiggins's report evaluates damages under three theories: (1) the value of the trade secrets to Monterey; (2) a reasonable royalty method; and (3) unjust enrichment. The crux, however, of Alcatel's overall damage theory is to seek recovery of the value of the intellectual property at the time of the alleged misappropriation. Alcatel uses the

---

[3] Alcatel's memorandum outlining its preliminary approach to damages, in response to which Cisco filed its original motion for summary judgment for lack of remedy, stated that "Cisco has not completed producing witnesses for depositions. Nor have the consultants working with Alcatel on damages issues finished their analyses. The presentation that follows is thus preliminary and Alcatel must reserve the right to modify its liability and damages theories as the evidence unfolds."

reasonable royalty and unjust enrichment models as methods of measuring that value.[4]  Furthermore, to approximate the value of Alcatel's intellectual property, Alcatel uses as a primary factor the acquisition price of Monterey.  Alcatel insists that the purchase price in September 1999 of Monterey, which consisted of a single product allegedly comprised of Alcatel's intellectual property, is a sound basis on which to measure the value of the alleged trade secrets.  According to Alcatel, if Monterey had not misappropriated Alcatel's valuable intellectual property, it would not have been able to develop its single and valuable product in such an abbreviated manner that permitted it to be displayed at the SuperComm Trade Show.  Without being shown to potential customers at SuperComm, Monterey would not have been selected for the "bake-off" (as a finalist) by AT&T, and consequently, Monterey would not have been an attractive acquisition by Cisco and would not have been purchased for the substantial price it was.

In May of 2002, Cisco filed its renewed motion for summary judgment for lack of remedy. [Doc. No. 628].  The Court heard oral arguments on October 17, 2002.  This motion, to which the Court now turns its attention, argues that the factual and legal sufficiency of Alcatel's damage

---

[4]  Alcatel's reasonable royalty and unjust enrichment theories are simply two different theories used to measure the value of the alleged trade secrets.  The value of the alleged trade secrets, furthermore, is essentially measured by the acquisition price of Monterey.  As Alcatel states in its response brief to Cisco's motions *in limine:*

> The starting point in measuring the amount of the defendant's unjust enrichment in this case is the amount that Cisco paid to acquire Monterey.  Monterey simply could not have realized that $535 million without the trade secrets it misappropriated from Alcatel.  It was therefore liable to Alcatel in that amount, and Cisco is today liable for that amount because it has succeeded to all of Monterey's liabilities.  Because the amount that Cisco paid to acquire Monterey is central to Alcatel's unjust enrichment theory, that evidence must be admitted.

Accordingly, while Alcatel's damage claim purports to rest on distinct theories, as a whole it is contingent upon the validity and reasonableness of using Monterey's purchase price as a sound foundation on which to base the value of the alleged secrets.

models, as reflected in Dr. Wiggins's report and declaration and other evidence submitted in opposition to Cisco's motion, warrant the summary dismissal of this case.

## SUMMARY JUDGMENT STANDARD

The granting of summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The trial court must resolve all reasonable doubts in favor of the party opposing the motion. *Casey Enters. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2554 (1986). The moving party satisfies its burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

Federal Rule of Civil Procedure 56 does not impose a duty on a district court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996) (citations omitted). Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Such nonmovant must also articulate the precise manner in which evidence he sets forth supports his claims. *See Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994) (citation omitted). Moreover, in designating specific facts, the nonmovant must "'go beyond the pleadings'" and use "'his own affidavits, . . . deposition[s], answers to interrogatories, and admissions on file.'" *Jones v. Sheehan & Young Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir. 1996)

9

(citation omitted).[5]

If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof, then summary judgment is appropriate. *Celotex*, 106 S. Ct. at 2552-53. Even if the nonmovant brings forth evidence in support of its allegations, summary judgment will be appropriate unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986) (citations omitted).

## DISCUSSION

In denying Cisco's original motion for summary judgment for lack of remedy, the Court relied on the principles espoused in *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974).   In that case, the court recognized that a reasonable royalty method provides a means of measuring the benefit to the defendant, which is the appropriate measure of damages where the secret has not been destroyed, where the plaintiff is unable to prove specific injury, and where the defendant has gained no actual profits by which to value the worth to the defendant of what it misappropriated. *Id.* at 536. The court in *University Computing* further noted that, "[w]here the damages are uncertain . . . we do not feel that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown." *Id* at 538-39. In relying on these and other principles, this Court previously denied Cisco's motion for

---

[5] The Court also notes that Local Rule CV-56(b) states that a party's response to a summary judgment motion should "be supported by appropriate citations to proper summary judgment evidence. . . ." Local Rule CV-56(c) further states that the Court will not "scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact for trial before entering summary judgment."

summary judgment for lack of remedy, in part, on the grounds that, because expert discovery was on-going and the factual development of this protracted case was still incomplete, Alcatel too should be afforded every opportunity to prove damages. In opposing Cisco's renewed motion for summary judgment, Alcatel once again beseeches this Court to provide it every opportunity to prove damages.

With the three and a half year development of this case, Alcatel's survival of one motion for summary judgment for lack of remedy, its submission of its report from Alcatel's damage expert, and having heard oral arguments on Alcatel's damage theory, the Court has afforded to Alcatel ample opportunity to present a damage theory that will be legally and factually sustainable. Now, in order to survive Defendant's motion for summary judgment, Alcatel must produce "evidence by which the jury can value the rights the defendant has obtained." *Id.* at 545. Furthermore, the value of these rights should not "be based on sheer speculation." *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1208 (5th Cir. 1986).

Alcatel's damages theory, as outlined in the numerous briefing and the expert report and declaration devoted to the damage's issue, indicates that Alcatel seeks to recover the value of the alleged trade secrets and that this value can be essentially based on a reasonable royalty or Monterey's alleged unjust enrichment. Alcatel further claims that the value of its intellectual property can be based upon the purchase price[6] of Monterey that occurred from its acquisition near September 1999. Dr. Wiggins opines that the total value of the alleged trade secrets was

---

[6] Dr. Wiggins's report states that Cisco agreed to purchase the remaining 90.25 percent of Monterey's equity on August 25, 1999. The transaction closed in late September 1999 for $517 million. Dr. Wiggins reasons that if 90.25 percent of the equity was worth $517 million, the remaining 9.75 percent of equity, which was previously purchased by Monterey, should be valued proportionately. Once done, a total value of $573 million results. This value, incidentally, exceeds the actual price paid for Monterey by nearly $40 million.

approximately $560 million in September 1999. This value was measured as the "actual market value of Monterey at the time of acquisition by Cisco minus Monterey's market value but for the misappropriation." (Wiggins Decl. ¶ 6). Furthermore, Wiggins's report states that the September 1999 acquisition date is "the most appropriate time to value the misappropriated trade secrets" and to calculate a hypothetical royalty negotiation. In addition, Alcatel contends that, because Monterey was a company with a single product, and that product, the Wavelength Router, was allegedly comprised of its intellectual property, the purchase price of Monterey is a sound basis on which to value the alleged trade secrets. Alcatel's theory, which is contingent upon numerous dubious and tenuous inferences, speculates in some cases that any one of the alleged trade secrets, such as trade secrets 4, 7 or 9, is essentially worth the purchase price of Monterey because had Monterey not misappropriated any of these alleged trade secrets, it would not have developed a prototype of the Wavelength Router in sufficient time to have been displayed at the SuperComm Trade Show. Without being shown at the trade show, AT&T would not have selected Monterey as a finalist; and finally, without being selected as a finalist by AT&T, Monterey would not have been a target for a Cisco acquisition.

In the Court's opinion, these assumptions and opinions, all of which serve as the foundation for Alcatel's damage theory, are simply too speculative. A break or non-occurrence in any of the above chain of events would eviscerate the foundation of Alcatel's damages, and consequently, Alcatel's damage theory is rendered exceedingly uncertain. This uncertainty is highlighted by the deposition testimony of one of Alcatel's own trade secret experts, Mr. Andrew Walding. Walding was designated and approved by this Court as Alcatel's expert witness in "marketing, design, and development of telecommunications products and related fields." Walding's expert report, on whose

12

opinions Dr. Wiggins's damages report partially rely, analyzes, among other things, whether alleged

trade secret 7, "knowledge of customer (AT&T's) requirements, preferences, and marketing

techniques," was misused and, if so, how Monterey and Cisco benefitted from the alleged misuse.

However, Mr. Walding's deposition testimony, which was elicited after Wiggins submitted his expert

report, concedes that a crucial assumption comprising Alcatel's damage theory, that Monterey would

not have secured the business of AT&T but for the alleged misappropriation of trade secret 7, is

inherently speculative.

> Q.  And is it your opinion that they [Monterey] would not have been invited to the bakeoff without that information?
>
> A.  I believe that the likelihood that they would have been invited to the bakeoff would have been significantly reduced. [I]t's very hard to be predictive.  You are asking me to - a philosophical question here because that's not what happened, right. [B]ut it's possible that they would not have been invited to the bakeoff.
>
> Q.  It is possible that they would have been invited to the bakeoff?
>
> A.  It's possible they would have.
>
> Q.  Okay.  I mean . . . is there a fair amount of speculation involved in trying to figure out whether they would have or would not have?
>
> A.  There is some speculation, of course, that's why I guess I'm being asked for my opinion. I'm being asked to speculate.

Furthermore, Walding also admitted that the assumption that Cisco would not have acquired

Monterey but for the alleged misappropriation of Trade Secret 7 is also an exercise in speculation.

> Q.  And do you have an opinion as to whether Monterey would still have been acquired by Cisco absent the use - any use of the alleged Trade Secret Number 7?
>
> A.  The likelihood that they would have been acquired would have been reduced.  To ultimately predict whether they would or would not have is, again, speculative.

Aside from the speculative assumptions on which Alcatel's damage theory rests, there is substantial uncertainty as to the amount of damages Alcatel allegedly suffered. In the Court's opinion, the value of the alleged trade secrets cannot be reasonably extrapolated from the purchase price of Monterey. Because Alcatel is not claiming it suffered lost profits from Monterey's alleged misappropriation or that Monterey or Cisco financially benefitted from direct sales, for example, of the allegedly infringing product, Alcatel's damage theory necessarily seeks to recover the value of the alleged secrets to Monterey/Cisco. Furthermore, this measure is to be calculated based on a reasonable royalty to which the parties would have agreed at the time of the alleged misappropriation. While the Court recognizes that some degree of speculation is inherent in calculating a suppositious licensing agreement between two parties that has never occurred, this hypothetical construct, however, must contain some degree of certitude. After all, the method does not permit the recovery of a simple royalty, but only a reasonable one. In this regard, Alcatel's attempt at recovering the value of the alleged trade secrets based largely on the acquisition price of Monterey, contravenes fundamental notions of reasonableness. *See Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986) (stating "[e]stimation of damages . . . should not be based on sheer speculation. If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable.").

Dr. Wiggins's declaration states, for example, that he "calculated the value of the misappropriated trade secrets as a whole to be approximately $560 million in September 1999," the approximate time of Monterey's acquisition. Although no act of alleged misappropriation occurred in September 1999, Dr. Wiggins's report opines that this acquisition date is the best time to measure the value of the alleged trade secrets. Furthermore, Wiggins states in his report that "the value of

14

the misappropriated technology represents the overwhelming majority of the value of Monterey when it was purchased by Cisco." There are numerous flaws with respect to Alcatel's methods of valuation. The acquisition of Monterey, first of all, occurred approximately six months after the last trade secret was allegedly misappropriated and almost a year and a half after the first trade secret misappropriation was completed. Alcatel's attempt, therefore, to attribute the sales price of Monterey to the value of the trade secrets that were allegedly misappropriated significantly earlier, violates the principle requiring the valuation of trade secrets being measured at the time of the alleged misappropriation.[7] *See Unisplay v. American Electronic Sign Co., Inc.,* 69 F.3d 512, 518 (Fed. Cir. 1995) (reversing reasonable royalty damage award on the grounds that it was not properly directed to the time the infringement began). Moreover, evidence of Monterey's purchase price in September 1999 is not evidence that would have been available to the parties to construct a hypothetical royalty negotiation during the times of alleged misappropriation in mid-1998 through May 1999.

While Wiggins's report does offer some attempt to value the alleged trade secrets as of May 1999, "the time of the initial misappropriation of the last trade secret," and October 1998, "the approximate time of the initial misappropriation by Monterey," these conclusory estimations of value, $469 million and $223 million, respectively, are essentially devoid of explanation and are largely subsumed by Alcatel's fixation on the valuation of the alleged trade secrets based on the September 1999 acquisition date. Indeed, Dr. Wiggins's declaration, which, unlike his expert report, was offered by Alcatel in opposition to Cisco's present motion for summary judgment, makes

---

[7] Significantly, the primary alleged act of misappropriation concerned the software programs and tools that Marian Trnkus created while at Alcatel. This alleged act of misappropriation occurred when Trnkus was hired by Monterey in July 1998, approximately one year before the Monterey acquisition.

absolutely no mention of valuing the alleged trade secrets at any time other than September 1999.[8]

Alcatel's attempt at valuing its alleged trade secrets by substantially relying on Monterey's acquisition price suffers for other reasons. For instance, Alcatel and its damages expert fail to present evidence of apportionment. On the one hand, Alcatel wholly fails to apportion its allegedly misappropriated and intangible intellectual property from the rest of Monterey's cross-connect product or Wavelength Router technology. Even further, however, Alcatel fails to apportion the value of its alleged trade secrets from the approximately $550 million price for which Monterey was purchased by Cisco. Instead, Alcatel essentially attempts to attribute every penny of Monterey's purchase price and every penny of the Wavelength Router technology to the value of its alleged trade secrets. This maneuver, however, reeks of incongruity and underscores the speculative nature of Alcatel's alleged damages.[9]

The closing purchase price in September 1999 of $517 million represented a part of a merger deal pursuant to which Cisco acquired the entire Monterey company, which included various intangibles and all of its employees, goodwill and other assets. Alcatel's contentions notwithstanding, the summary judgment evidence indicates that the transaction was neither equivalent to an asset purchase of the Wavelength Router nor an asset purchase of the alleged trade secrets on which the Wavelength Router was alleged to have been partially based. The price for

---

[8] Nevertheless, the valuation of the alleged trade secrets based on all dates, even those prior to the September 1999 acquisition date, still use as a foundation the value of Monterey as a whole. And as it discusses in this Order, the Court is troubled both by Alcatel's attempt to equate the value of Monterey as a company to the value of its alleged trade secrets and to equate the value of the Wavelength Router to the complete value of its alleged trade secrets.

[9] Moreover, "the very definition of a reasonable royalty assumes that, after payment, 'the infringer will be left with a profit.'" *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1122 (S.D.N.Y. 1970) (citation omitted). Here, Alcatel's damage theory and its attempt to essentially recover the complete value of Monterey would not leave Cisco with a profit.

which Cisco acquired Monterey was based in part on Cisco's own internal speculative projections of the potential future profitability of the Wavelength Router. These projections, however, were based on sales that never occurred and on the anticipated success of an unproven product in an emerging and very competitive field. When Cisco acquired Monterey by September 1999, it valued the remainder acquisition at approximately $517 million. This acquisition price, according to Cisco's summary of the "Monterey acquisition journal entries," was comprised of three primary components: (1) $354 million attributed to in-process research and development, (2) $102 million attributed to goodwill, and (3) $52 million attributed to other intangibles. While the Court assumes the value of Monterey represents the price that Cisco paid, this purchase price is simply not a reasonable or sufficiently reliable approximation of the value of the allegedly misappropriated intellectual property. Even assuming Monterey as a company was worth its purchase price and that its sole product was comprised partially of Alcatel's intellectual property that was misappropriated in mid-1998 through mid-1999, it does not logically follow that the value of this intellectual property can be equated to the approximate price for which Monterey was purchased in September 1999. Nor is it reasonable to assume that had Monterey not allegedly misappropriated Alcatel's intellectual property, it would not have been able to demonstrate its product at SuperComm, which led to AT&T's prospective business and ultimate purchase of Monterey by Cisco.

These tenuous inferences and unsupported assumptions, upon which Alcatel's entire damage theory rests, are not reasonable or reliable evidence from which a jury can properly value the rights that Cisco allegedly obtained. While damages need not be established with mathematical precision, "the evidence must provide a basis for reasonable inferences." *Dyll v. Adams,* 167 F.3d 945, 947 (5th Cir. 1999) (citing *Richter, S.A. v. Bank of America National Trust and Savings Ass'n,* 939 F.2d

17

1176, 1188 (5th Cir. 1991)) (citation omitted).  No case, including *University Computing*, holds that the acquisition price of a company can provide the measure of a reasonable royalty in the absence of actual lost profits.  Furthermore, in the context of cases involving lost profits, purchase price evidence is inadmissible where it is based on speculative profit projections based on "uncertain or changing market conditions, or on changing business opportunities, or on promotion of untested products, or entry into an unknown or unviable markets, or on the success of a new and unproven enterprise."  *Texas Instruments v. Teletron Energy Mgt.,* 877 S.W.2d 276, 279 (Tex. 1994).

In a recently decided case, the Federal Circuit confirmed the limitations in the patent context of using the acquisition price of a company to base a reasonable royalty.  *See Transclean Corp. v. Bridgewood Services, Inc.,* 290 F.3d 1364, 1375-1377 (Fed. Cir. 2002).  At issue in *Transclean* was the infringement of a patent involving a device used for changing automatic transmission fluid.  The defendant's product was ultimately found to infringe plaintiff's patent.  The defendant subsequently sold its business to another company, and the plaintiff attempted to claim as damages the amount of money that the defendant received for the sale of its business.  The jury awarded damages based on the purchase price of the defendant's business.  The Federal Circuit reversed the portion of the damages award comprised of the purchase price evidence.  Like Alcatel, Transclean argued it was entitled to the entire amount received by the defendant for its business "because Bridgewood's sole source of revenue was an infringing product and Bridgewood generated $6,500,000 in goodwill from the sale of its business Century."  *Id.* at 1375.  In disagreeing with this contention, the Federal Circuit clarified that the price received by an infringing defendant for the sale of its business is not sound evidence on which to measure damages in a reasonable royalty case.  In so doing, the court stated:

> Reasonable royalty damages for patent infringement arise from the fact of infringement, and the portion of the sales price consisting of intangible goodwill is not the sale of infringing goods. It is partial compensation for the sale of a business . . . . [T]he portion of a sales price consisting of goodwill, *i.e.,* compensation in excess of tangible assets, is not sales of infringing goods that can form the base for determination of a reasonable royalty.

*Id.* at 1376.  This Court, therefore, rejects Alcatel's attempt to value its alleged trade secrets, and thus a reasonable royalty and Monterey's alleged unjust enrichment, by substantially relying on the acquisition price of Monterey.

Aside from the purchase price of Monterey, there is little, if any, sound and reliable evidence from which to derive a dollar value for the alleged trade secrets.  We have no lost profits suffered by Alcatel and no actual sales enjoyed by Monterey or Cisco with respect to the offending product from which a royalty or any measure of damages could be apportioned.  Although the absence of lost profits by a plaintiff or gained profits by a defendant does not, nor should not, insulate a defendant "from being obliged to pay for what they wrongfully obtained in the mistaken belief their theft would benefit them[,]" *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 536 (5th Cir. 1974), a plaintiff must, nevertheless, introduce evidence "by which the jury can value the rights the defendant has obtained." *Id.* at 545.  Alcatel has failed in this respect.  No sound evidence is offered to derive a value of a hypothetical license agreement into which Alcatel would have entered with Monterey between mid-1998 and mid-1999.  In *University Computing,* the jury was presented with actual evidence of prior licensing fees earned by the plaintiff for the exact same technology allegedly misappropriated.  *Id.* at 529.  In the present case, however, no such evidence exists. Furthermore, the reasonable royalty in *University Computing* was calculated based on evidence of a $220,000 license previously offered by the plaintiff to another company.  *Id.* at 543-46.  Here, Alcatel has not presented any evidence of previous licenses into which it entered, or offered to enter,

with other comparable companies based on this or similar technology. The evidence on which Alcatel relies is similarly deficient in other crucial respects. There is no sound evidence, for example, of actual royalty discussions between the parties for the subject technology, no sound evidence of either Alcatel's precise costs incurred for developing the intellectual property or the financial costs saved by Monterey for allegedly misappropriating the intellectual property, no evidence demonstrating the price at which Alcatel sells any of its products comprised of this or other comparable technology, and no evidence indicating the amount that Monterey or Cisco would have sold the subject technology.[10]

In essence, there are only the opinions of Dr. Wiggins, who unpersuasively advocates, among other things, that the value of the alleged trade secrets can be derived from the purchase price of Monterey.[11] While this measure of conjectural damages would unequivocally yield the most substantial award, the imposition of this measure would inevitably require the fact-finder to engage in substantial speculation. Because Alcatel has failed to meet its burden of presenting sufficient evidence demonstrating a triable issue of material fact as to actual damages recoverable under a valid legal theory, Cisco's motion for summary judgment for lack of remedy should be granted.

---

[10] The district court in *University Computing Co. v. Lykes-Youngstown Corp.,* instructed the jury that some of these factors should be considered in arriving at the proper damages for defendant's misappropriation. The Fifth Circuit affirmed.

[11] Aside from the expert testimony of Dr. Wiggins, Alcatel alludes to some categories of "other evidence" it claims supports its substantial prospective recovery. These "other categories," which vaguely trace a portion of the factors referenced in *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), are insufficient to overcome the substantial speculation plaguing the substance of Alcatel's damage theory. Without undertaking an exhaustive examination into all of the shortcomings with respect to Alcatel's categories of "other evidence," the Court will note that little of Alcatel's proffered evidence is relevant to the actual calculation of damages. As to the evidence which does relate to the calculation of damages, such evidence, largely for reasons set forth in this order, does not adequately support its damage claim.

Having made this determination, the Court now considers whether the granting of Cisco's renewed motion for summary judgment for lack of remedy is dispositive of all affirmative claims asserted by Alcatel. Among the claims advanced by Alcatel is a cause of action under the Texas Theft Liability Act. *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001 *et seq.* (Vernon 1997). Although Alcatel has not demonstrated a legally sustainable theory to recover actual damages, Alcatel insists that if it were to obtain a favorable verdict, it may recover statutory damages, attorneys' fees and court costs pursuant to sections 134.005(a)(1)-(b), as these awards are independent and not contingent upon an award of actual damages.[12]

Section 134.005(a) of the Texas Theft Liability Act provides that "a person who has sustained damages resulting from theft may recover" the amount of actual damages and, "in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000." A plain reading of this provision clearly reveals that an award of $1,000 statutory damages is contingent upon an award of actual damages. *See Rodgers v. RAB Investments, Ltd.,* 816 S.W.2d 543, 551 (Tex. App. –Dallas 1991, no writ) (citing *ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 256 (Tex. App.–Dallas, no writ)) (interpreting similar statutory language and stating "there must be a recovery of money or

---

[12] While Alcatel did not specifically plead a request for statutory damages, costs or attorneys' fees in any of its pleadings, such awards are inherently permitted under the plain language of the Texas Theft Liability Act and Alcatel's intent to seek such awards was expressly manifested in the parties' proposed Joint Final Pretrial Order submitted on July 12, 2002 in anticipation of an August 2002 trial date. Accordingly, Alcatel's failure to plead attorney's fees, for example, as an item of special damages should not amount to a waiver because Cisco has been on notice of such request since at least July 2002. *See United Industries, Inc. v. Simon-Hartley, Ltd.,* 91 F.3d 762, 764-65 (5th Cir. 1996) (citing *Crosby v. Old Republic Ins., Co.,* 978 F.2d 210 n.1 (5th Cir 1992)) (noting that an exception to the general rule that failure to plead attorneys' fees as item of special damages bars later recovery may exist when the issue is included in a pretrial order); *see also Wilson v. William Hall Chevrolet, Inc.,* 871 F.Supp. 279, 282-83 (S.D. Miss. 1994) (stating that where "there is no *right* to attorney's fees inherent in the claim upon which the request for such fees is predicated, the failure to request fees in the pleadings or otherwise prior to the jury's verdict precludes their recovery.") (emphasis original).

something of value; otherwise, the attorneys' fee award cannot be described as an 'addition' to the claimant's relief."). Alcatel's inability to recover actual damages thus precludes its recovery of statutory damages pursuant to the express language of section 134.005(a).[13]

The next issue is whether Alcatel, who hopes to ultimately secure a verdict in its favor, may recover attorney's fees and court costs as a prevailing party. Section 134.005(b) of the Texas Theft Liability Act states that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." Urging that attorneys' fees in this protracted litigation would be exceedingly substantial, Alcatel contends that its ability to recover such fees and costs has not been impaired by its inability to recover an award of actual or statutory damages. In support of this proposition, Alcatel relies on *Johns v. Ram-Forwarding, Inc.,* 29 S.W.3d 635, 637-38 (Tex.App.–Houston [1st Dist.] 2000, no pet.).

In *Johns*, the plaintiff, Ram-Forwarding, brought an action against its former employee for, among other things, conversion and civil theft. *Id.* at 636. The heart of the dispute concerned the allegations that Johns stole money and other items from the company during his five-year tenure as vice president with Ram-Forwarding. *Id.* At the end of trial, the jury found for plaintiff under its claims for conversion and civil theft. *Id.* at 637. The jury awarded plaintiff approximately $46,000 for conversion but $0 in actual damages for its claim under the Texas Theft Liability Act. In addition, an award of attorney's fees of over $50,000 was recovered. On appeal, Johns argued that

---

[13] Furthermore, punitive damages are not recoverable as a general rule in the absence of actual damages. *See Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 754-55 (Tex. 1984) (stating "[t]he Texas cases are unanimous in holding that recovery of actual damages is prerequisite to receipt of exemplary damages."); *see also Snead v. Redland Aggregates Ltd..,* 998 F.2d 1325, 1334-1335 (5th Cir. 1993) (recognizing that mere award of nominal damages is insufficient to recover punitive damages and that plaintiffs are foreclosed from recovering punitive damages unless the fact-finder has awarded actual damages) (citation omitted).

the trial court erred by awarding plaintiff attorney's fees under the Texas Theft Liability Act because the jury awarded zero damages under its claim for civil theft. In disagreeing with Appellant, the court of appeals ruled that plaintiff was "entitled to recover attorney's fees even though it recovered zero damages for its civil theft claim." *Id* at 638.

Taken to its logical extreme, the *Johns* decision seemingly attaches prevailing party status for purposes of fee awards upon any plaintiff who obtains a judgment in its favor under a claim for civil theft, irrespective of whether or not any relief was afforded in equity or at law. To the extent *Johns* invites such classification, this Court respectfully disagrees. The United States Supreme Court recently had occasion to revisit the case law regarding prevailing parties in *Buckhannon v. West Virginia Department of Health and Human Services,* 121 S.Ct. 1835 (2001). There, the Court rejected the "catalyst theory;" which permitted attorney's fees when the litigation has resulted in a voluntary change in behavior by the defendant. In so doing, the Court clarified the definition of "prevailing party." The Court began its discussion by stating the general rule that a prevailing party "is one who has been awarded some relief by the court." *Buckhannon,* 121 S.Ct. at 1839. This relief need not be extensive and "even an award of nominal damages suffices." *Id.* at 1840. Furthermore, judgments on the merits or settlements enforced through consent decrees, may serve as the basis for an award of attorney's fees. *See Maher v. Gagne,* 100 S.Ct. 2570, 2574 (1980). However, "[w]hatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement." *Farrar v. Hobby,* 113 S.Ct. 566, 573 (1992) (citing *Hewitt v. Helms,* 107 S.Ct. 2672, 2677 (1987)). "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar,* 113 S.Ct. at 573. Moreover, the material alteration of the

23

legal relationship between the parties does not occur "until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." *Id.* at 574.

When analyzed against this backdrop of prior Supreme Court jurisprudence, the decision in *Johns,* as well as other decisions on which Alcatel relies, comes into sharper focus and can be distinguished from the present case. Although the plaintiff in *Johns* did not recover actual damages pursuant to its civil theft claim, it did obtain an award of over $46,000 for conversion. This conversion claim, moreover, was overlapping of its claim for civil theft, as it was brought by the employer in order to redress the same rights that involved the same corpus comprising plaintiff's civil theft claim. Therefore, while plaintiff may not have recovered actual damages specifically under its claim for civil theft, plaintiff nevertheless was a prevailing party in the underlying suit because it did obtain relief and was vindicated by the trial court's judgment. *See, e.g., City of Amarillo v. Glick,* 991 S.W.2d 14 (Tex. App.–Amarillo 1997, no pet.) (ruling that trial court did not abuse its discretion in awarding attorney's fees to police officers as prevailing parties because, although no damages were recovered and officers did not receive all relief requested, the officers nevertheless "prevailed on the main issue in the case" because the effect of the trial court's ruling was that the promotion exams at issue were void).

In the instant case, despite its inability to recover any damages or equitable relief, Alcatel urges this Court for an opportunity to proceed to trial to potentially obtain a favorable verdict. No material relief is available to Alcatel. Instead, the sole purpose of a trial would be to obtain a potential judgment that would provide a possible predicate for a fee award. The Court declines Alcatel's invitation for a trial for this purpose. In order for Alcatel to hold the status of prevailing party for purposes of recovering attorneys' fees, it "must obtain an enforceable judgment against the

24

defendant from whom fees are sought." *Id.* at 573. And although the award of mere nominal damages could suffice, such an award at least serves to modify the defendant's behavior to plaintiff's benefit by "forcing the defendant to pay an amount of money he otherwise would not pay." *Id.* at 574. Here, no damages in any form are recoverable.[14] Under these circumstances, the Court will not permit the award of attorneys' fees. *See Tunison v. Continental Airlines Corp., Inc.,* 162 F.3d 1187, 1190 (D.C. Cir. 1998) (citing *Robinson v. City of St. Charles,* 972 F.2d 974, 976 (8th Cir. 1992)) (citations omitted). "[A] judgment with no damages at all is not an 'enforceable judgment'– there is simply nothing to enforce. While an empty judgment may provide some moral satisfaction, such a judgment carries no relief and thus does not entitle the judgment winner to be treated as a prevailing party." Accordingly, in addition to actual damages, Alcatel may not recover statutory damages, court costs or attorney's fees. The granting of Cisco's present renewed motion for summary judgment, therefore, is dispositive of all claims in this suit. All other relief not expressly granted herein is denied.

IT IS SO ORDERED.

SIGNED this /7*th* day of December 2002.

_____
UNITED STATES DISTRICT JUDGE

---

[14] The Court declines Alcatel's requested attempt to recover attorney's fees by proceeding to trial to potentially recover mere nominal damages. Aside from resulting in a gross misuse of judicial and client resources, the Court is not persuaded that an award of nominal damages are even available in this case, which does not involve a constitutional violation or a statute expressly providing for such damages. *See, e.g., Sterkenburg v. Bittner,* 1999 WL 190241 (Tex. App.–Austin 1999, no pet.). Moreover, although the United States Supreme Court held that a plaintiff recovering nominal damages is a prevailing party in an action brought under section 1988, the Court also indicated that "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, *the only reasonable fee is usually no fee at all." Farrar v. Hobby,* 113 S.Ct. 566, 575 (1992) (emphasis added).